and Dr. Gomez. Nancy Wood-Grigori is here for the appellants. Doctors Rodriguez and Gomez, and Nicole Danielle Duga-Walsh is here for the appellee. Christmas and Ms. Grigori, you may begin. Good morning, Your Honors. My name is Nancy Grigori for Doctors Rodriguez and Gomez. The issue in the case is one that's been before the court numerous times. It's whether Ricky Christmas established a serious medical need and that that serious medical need was understandably understood by the defendant doctors and deliberately ignored the treatment. The three serious medical needs that were claimed below are the lack of pain medications, the absence of a hernia repair, and the colostomy reversal refusal. The colostomy reversal refusal was not raised in the answer brief, and so I've argued in the reply brief that that ground was waived. As far as the hernia repair, the outside doctor that Mr. Christmas wanted to see, Dr. Skarda, eventually saw Mr. Christmas and did not do any repair to the hernia or, for that matter, any colostomy reversal until Mr. Christmas came to see him. That's because the jail didn't send him back over there until then. But even after Mr. Christmas, Mr. Christmas started seeing Dr. Skarda again in 2017, and even so, the repairs, the operations weren't done. Well, he had a follow-up visit in May of 2018 with Dr. Skarda, but the surgery wasn't performed until 2020, and obviously Mr. Christmas can't get to the doctor since he's in prison without approval from a doctor to let him know that they can send him to get this surgery, correct? That is true, but Dr. Skarda testified that these surgeries were not emergent. The standard at the Polk County Jail, and this comes from a national correctional institution standard, and it makes common sense, too, because these are taxpayer dollars that are being spent for this, and these guidelines say that surgeries are not elective when you're in jail. Surgeries are emergent, and Dr. Skarda testified, and Dr. Regas testified, and Dr. Gomez testified that these were not emergent surgeries, and the cases from this point of view... Well, that's not what the district judge said in her order denying the motion for a new trial or a judgment notwithstanding the verdict. I'm looking at page 16 of the judge's order. She says, when asked whether performing surgery earlier, such as December 2016, would have reduced or relieved Christmas' pain, Dr. Skarda responded, yes, I would presume that would have happened, to whether his pain situation had been vastly improved as a result of the surgery. Dr. Skarda also testified that had the surgery occurred early, she saw no reason why it would not have been equally as successful. Further, in her view, Christmas would have avoided the inconvenience and difficulties of having to walk around with a colostomy for three or four years. That's true, Your Honor, but those are not the standards for a violation of 42 U.S.C. 1983. He was uncomfortable, yes, Dr. Skarda said, but he wasn't riding in pain. She, in increasing his pain medications, gave him only ibuprofen. And the standard in jails, and this is universally true, is that narcotics are kept to an absolute minimum, virtually nonexistent, because of the dangers that narcotics present in jail situations. But the problem is, we have a jury verdict here, and we have stated that in the deliberate indifference context, severe pain that is not promptly or adequately treated can constitute a serious medical need, depending on the circumstances. And Mr. Christmas' testimony at trial raised, wouldn't you agree that it raised a substantial evidentiary conflict with your position? And if so, wouldn't that preclude judgment as a matter of law? Except that this has to be an objectively considered standard. Mr. Christmas was treated over 100 times during the period of time that we're And he kept constantly advising the medical staff that he was in serious pain, that his mesh that was, in essence, keeping his stomach together and his insides from spilling out, was old and hurting, and was, in essence, he was rotting. I mean, I As far as the mesh goes, Dr. Skarda testified that the herniated lipator was not necessary. And look at the period of time between February 2018 and February 2020, that that mesh stayed in place before the surgery, and there's no evidence in the record There's evidence in the record, which I found really disconcerting, that Christmas testified that an inmate who requested or had more than four sick calls in the span of 30 days had a withhold of Tylenol or other treatment for two weeks or longer. Christmas testified to that, but the medical records dispute that. The medical records show that at least two occasions Mr. Christmas was given Tylenol 650, which is the standard that is given to cancer patients for the pain that cancer patients suffer. Because that was how much pain he was in, and he was in that pain for years. But he was given the Tylenol to the extent he could be given the Tylenol, and it wasn't the only drug he was given. He was given four or five other drugs, and although they are drugs that are prescribed by psychiatrists, the record is undisputed that those drugs all And what happened after he had the surgery? His pain subsided, correct? He said his pain subsided. Subsided, yes, correct. Years later. But the pain does not satisfy the standard that there is a significant danger of substantial harm. There is no use in pain. Pain is a subjective issue. Most of the cases that are cited in the briefs, they're objective things. There's cancer. There's broken bones. There's attacks in jail. There are objective signs. And I believe we have a case that says even a broken bone, if it's not tended to for a long period of time, may constitute deliberate indifference, correct? That's true. That's absolutely true, Your Honor. And that's only a few hours, not years. That's right. But the two standards are different. The deliberate indifference to it is not what I'm talking about. I'm talking about the substantial medical need. The substantial medical need of pain is a highly subjective standard, not an objective standard. If you look at the medical records, the medical records are in Document 152 and 153. You can see the number of times that Mr. Christmas asked for help and received help to ease pain. But the jury didn't have to rely on medical records alone because we've got a lot of authority. Melton v. Abston, Forrest v. West, where we said, you know, you can establish a serious medical need as diagnosed by a physician or you can establish it as one that is so obvious that even a layperson would easily recognize the necessity for doctor's attention. And so that's really what he's relying on here, to establish a serious medical need, that it was so obvious that even a layperson would easily recognize the necessity for doctor's attention. Except, Your Honor, I would take the position that the difference between broken bones and babies who are attacked in prison and their physical injuries, those are objective injuries. We're talking about pain. But this is an objective injury, too. He had been shot before he was put in prison and he has the colostomy and he has a hernia. These are all visual things and we also, I mean, that I think even a layperson would appreciate the severity. And again, you're dealing with after a jury verdict. That is true. But under Rule 50, the court's standard review is de novo. It's not to defer to the jury bindings or to the trial court's orders. And so I come back to my point that there is a difference between mere pain. You know, we can set aside the hernia repair and set aside the colostomy reversal because Dr. Skarda set them aside. Dr. Skarda said neither one was emergent. They can wait. And in fact, they waited until February 2020 when Dr. Skarda was seeing Ricky Christmas on a regular basis. There were six different times that Dr. Skarda saw him and neither one of them could have resulted in the surgery. And they didn't because she was preparing him for the surgery. She was bringing him up to the point where he could have the surgery. So that leaves the pain. The pain in and of itself, in isolation, is subjective, not objective. But we do have pain over time. And what about the fact that there is a medical, a note from a nurse in Christmas' medical records in which the nurse wrote, as I'm sure that my medical staff has told you before, we do not treat chronic pain. Why could a reasonable jury not conclude based on this note that the jail had a policy of not treating chronic pain and that the policy resulted in Christmas' harms? Could I answer you in my time as well? Please. Okay. Number one, the record also shows that Ricky Christmas was treated in the chronic pain clinic. Number two, the record shows that this woman, AHSA, was not a Khorizon employee. She was an independent employee from another group. And when she says, my folks don't treat pain, she didn't mean the Khorizon folks. She meant her group of people. And so the fact that she said that is disputed by the entire rest of the record. Well, we've got evidence in this record that his pain was so bad he blacked out, and all that was done is they sent him back to a cell to rest. And this is what the jury, this is some of the evidence that the jury heard in arriving at its verdict. This is as bad a case as it can be for the defendants. But the point that he blacked out and was sent back to his jail room, he was already on every single medication they were authorized to give him. You know, at some point, you can't just simply give more medication to prisoners because, one, it violates the prison guidelines, two, it violates the national guidelines, and three, it's not. Ricky Christmas had one kidney. You can't just keep. Yeah, I think his concern was, I need to be sent back to Shands so that I can have this colostomy removed. And there was a delay. There was a delay in sending him back to the hospital in order to have the surgery done to relieve his pain. There was a delay. It was like, what, four years? Yes. Well, Dr. Skarda saw him starting in 2018. This period of time here is until December 17. In December 17, Ricky Christmas no longer claimed a violation of 42 U.S.C. 1983. So from December 17 on, Dr. Skarda saw him, and other outside doctors saw him at Lake County General numerous times, but still did not operate on either the hernia or the colostomy until 2020. But the testimony was that in May of 2018, there was a discussion and a planning to have a surgical procedure done by Dr. Skarda, and for whatever reason, after that May 18 visit, the repair and the reversal wasn't done until February of 2020. That's true. It wasn't like in May of 2018, Dr. Skarda wasn't talking about doing that surgery. That's absolutely true. Even before Ricky Christmas went to jail. I understand there's a pandemic in the middle, but the pandemic did not start until 2020. Right, but there's no evidence in the record that it was anybody's decision, but Dr. Skarda's not to do the surgery until 2020. And before Ricky Christmas went to jail, just days before, he had a discussion with the doctor about... I know, since I know your time is up, maybe during rebuttal you can tell me where in the record it is, because I don't see that in the record. I actually want to ask a question before I let you sit down. You were, we're talking about dates and periods. What do you argue is the legally relevant period for us to be looking at? I think the entire period, but... All the way up through 2020. That's exactly right. And before the period of time when Ricky Christmas alleges, he alleges December of 2016 to November of 2017. I think it's important to look at the period of time, what happened then, and the period after, what happened then. So he has alleged, because in his complaint, he hasn't alleged that he was refused proper medical treatment before December 1 of 2016. Yes. And then he did say before, he was, he's alleging deliberate indifference before December 1 of 2016 or no? No, he's not alleging... Okay, he's saying that's when it starts. Yes. And then at summary judgment, the district court ruled that Christmas had no tribal deliberate indifference claim after November 5 of 2017. Correct, because he was sent to the outside... So, we're looking at his claim as that period. You're saying there's relevant information outside of that period. Yes. And if you look at the medical records, his requests for medical care extend beyond November of 2017. It extends well into 2018. So, there really is deliberate indifference. I really didn't get to deliberate indifference. I think that these two doctors, they did everything they could do, particularly Dr. Gomez. She never saw Ricky Christmas before. He admitted she saw him in passing, and he claimed that he repeatedly asked her for treatment. There's nothing in the medical records, and these medical records are pretty complete. They lay down everything in these jails because of these kinds of situations. So, Judge Algoa, I will find that for you, but I know my time has significantly elapsed. All right. Thank you, Mrs. Algoa. I have a few seconds I have left. Whatever you reserved before you have it on rebuttal. Thank you. Thank you. Ms. Walsh. Good morning, Your Honor. May I please have the court? My name is Nicole Walsh with Hillward & Henderson in Tampa, Florida, and I represent the appellee, Mr. Ricky Christmas. And we are requesting that the court affirm the judgment entered in the district court reflecting the jury's verdict, as well as affirm the judgment of the district court in denying appellant's motions for judgment as a matter of law, in motion for new trial, and in granting appellee's motions for leave to amend as to the issues of supervisor liability and punitive damages. To initially address appellant's argument that we've waived the colostomy reversal, that was raised in our brief. We maintain we did not waive that argument. That is one of the issues that he was complaining of. It really goes hand in hand with the hernia repair issue. To also address appellant's argument, there was no evidence put forth that there is a protocol that only emergent surgeries are treated. Obviously, you all saw on the record that they specifically stated that non-emergent surgeries were not treated, and the doctors maintained that they denied that that's the protocol, even though there was written evidence of it. Let me ask you a question about the surgery. What are we to make of the fact that at trial, Mr. Christmas's outside specialist, Dr. Skarda, testified that it took over two years from the initial referral in December of 2017 to complete the colostomy reversal surgery, and then in the interim she prescribed only ibuprofen for Mr. Christmas? Yes. So Dr. Skarda did testify as to that. She also testified that she would have done it as soon as possible, that hernia surgeries are necessary surgeries. It was not necessarily emergent. Emergent means it has to be done immediately, right then, or they are going to die. But it is a necessary surgery. It is not elective. It has to be done. They do not repair on their own. She also testified that she... But if it was urgent, why wouldn't Dr. Skarda have bumped the surgery up as a priority? She testified that she had no control over scheduling his surgery. The records indicate, as Judge Lagoa pointed out, that he was recommended for it pretty early on in May of 18. The medical records also indicate that there was financial authority pending in several instances. So there was really no testimony she could offer as to why it wasn't until February of 2020 that they were not able to see him. Mr. Ricky Christmas was repeatedly asking for these surgeries. He was indicating his doctor's death statement that he needed them. But it was out of his control, and Dr. Skarda testified it was out of her control. What about the fact that she prescribed only ibuprofen to get him through the period of surgery, which is what he was receiving at the jail, if not a little bit more? She testified that she was unable to prescribe him anything further. I think the records even indicated at one point in time that he was, I think prior to entry to jail, was prescribed heavier pain medications. And the jail, even if he was prescribed those, would not have given them to him because they're not permitted to, per their testimony. Well, let me ask you this now. Negligence or even extreme negligence won't cut it, right? Yes. I mean, you've got to have a serious medical condition that the doctors were deliberately indifferent to. The doctors say that all the evidence establishes in this case is that at the most they were negligent, and that doesn't cut it. So, therefore, they should have received judgment notwithstanding the verdict. Yes, sir. And I think the evidence here indicates otherwise, especially when you look at all the case law that has been cited. There's numerous, numerous cases that discuss what constitutes a serious medical need and what constitutes deliberate indifference to that serious medical need. Here there was an objectively serious medical need. There was a visible hernia. There's no dispute that at the time he was admitted in April 2016, he had at least two ventral hernias. He had a colostomy bag that was also visibly deteriorating, per his testimony. And he repeatedly complained of pain, fearing that he would die if this was not treated. So that's an objectively serious medical need, and I think that's sufficient when you look at the case law. Pain alone can constitute a serious medical need. There's plenty of cases that indicate that. Additionally, the deliberate indifference. Here they simply prescribed Tylenol, and they didn't do anything further. So opposing counsel indicated, you know, you can't just keep prescribing Tylenol over and over again. Is it your position, and I just want to be clear, the prison was, is it a policy that they don't like to prescribe anything that is heavier than Tylenol that would be a narcotic? That's what the doctors testified to. I did not see. There's nothing in the evidence that there's any written policy as to that. The policy is that the written policy that the inmates are to receive the care they need. I believe Dr. Rodriguez and Gomez testified that they can only prescribe certain levels of Tylenol and that they're not permitted to prescribe heavier doses. So like an oxy or any other kind of pain medication like that? Correct. And Mr. Christmas actually had allergies to, I believe, oxycodone. And so going back to my earlier point, Mr. Christmas continued to complain of pain, yet the doctors did nothing to investigate. There was no inquiry or investigation as to whether there was anything else to be done. You know, they don't want to keep prescribing them Tylenol. Well, look at what's the alternative to prevent those continued prescriptions. They never testified. X-rays can be performed on site at Polk County Jail. They're performed twice a week, yet at no point in time did they even refer him for an X-ray to determine whether the hernia needed additional treatment. They never did that up until this November 5, 2017 date. And that is why at that point in time the district court ruled that from November 5, 2017 onward, they could not be considered deliberately indifferent because that is the first time they actually did something aside from merely prescribing Tylenol and nothing further. And so we are maintaining that there was no investigation and no inquiry into what else could be done to address his needs. And we believe the case law supports that that is sufficient for a deliberate indifference claim in these cases. And if the court does not have any additional questions, I believe I addressed everything that counsel indicated, but I'm happy to discuss any additional questions that the court may have. All right. Thank you. I think we have the argument. Ms. Grigori, you've reserved some time for rebuttal. Thank you, Judge. As far as the colostomy, I saw nothing in the answer brief. If I'm wrong, I apologize, but I saw focus on the hernia repair and the pain. As far as the hernia repair, Dr. Skarda, at the transcript three, that's the third day of trial, page 62, said there was nothing about the hernia that needed immediate attention. That's the standard, and there's nothing. The Corizon policies. But that's the standard. That's the standard for Corizon for the jail. That's the policy. Correct. So the policy is unless it's an emergency, i.e., you're dying, we will not do a surgery for you. That is Corizon's policy, and Corizon was dismissed from the case by the court's order because the court said there's nothing about the policies that Mr. Christmas has alleged or proven violates 42 U.S.C. 1983. So Corizon and his policies are out. Dr. Gomez followed Corizon's policies, which are national policies for correctional institutions. The evidence is undisputed that Corizon simply adopts them, and Dr. Gomez has to sign off on them every year. And the only evidence in the record that Dr. Gomez had anything to do with Ricky Christmas's treatment was per Dr. Gomez. But if you look at the medical records in 152 and 153, it also says as many times as per Dr. Gomez, per protocol. So in 2020, no, in February of 2020 when Mr. Christmas had his surgery, was it then emergent? We don't even know if it was then because Dr. Skarda didn't testify that it was emergent.  No, no, but it doesn't matter because Dr. Skarda didn't have the ability to get Mr. Christmas out of jail to go get surgery. So what was the determination or what is the testimony or the evidence in the record as to why finally in February of 2020 a decision was made to transfer Mr. Christmas to have his surgery? Well, first of all, Dr. Skarda testified that she did not believe that either Dr. Rodriguez or Dr. Gomez were involved. That's not my question. My question is what is the record evidence as to why the decision was made at the jail to finally allow Mr. Christmas to have a surgery in February of 2020? Is there anything in the record that shows that his condition had become emergent? There is no evidence in the record that the jail made the decision to have Ricky Christmas have the surgery. Dr. Skarda testified. Well, how did he get out to have the surgery? Did he walk out? No, he's transported from the jail to Lake County Hospital. Who made that decision? That's not in the record, Your Honor. Okay. There's nothing in the record that says that either Dr. Rodriguez or Dr. Gomez would not release him to Dr. Skarda. He started seeing Dr. Skarda. In fact, that's outside the period of time that's at issue here. The period of time at issue here ends on November 5, 2017. So anything that Korizon or Rodriguez or Gomez did or didn't do after November 5, 2017 is not alleged or irrelevant for this. The point is that Ricky Christmas had the surgery when Dr. Skarda decided he was ready for the surgery because the evidence is that she was preparing him for surgery up until the time he had it in 2020. She was preparing him for surgery. Nothing in the record shows that Korizon or Rodriguez or Gomez refused to permit him to have the surgery up until that time. From November 5 on, Dr. Rodriguez recognized a serious medical need because Ricky Christmas' condition had changed, had worsened, had exacerbated. That's when Rodriguez sent him out, and that's when the ball started rolling to have the surgeries that took place in 2020. And there's no evidence in the record to contradict that. Finally, as far as the medications, the strongest thing they could give, and this is also undisputed in the record, is the Tylenol 650. They are not permitted to give anything beyond that, nor did Dr. Skarda give anything beyond that. And she said he was in pain, yes, from the bullet fragments in his back. She didn't even relate it to the hernia or the colostomy. She said the bullet fragments in his back. She gave him as much as she thought was appropriate, given the fact that he has one kidney. And all of these medications negatively impact kidney function. So between Dr. Skarda's medical judgment and Korizon's guidelines, Ricky Christmas was getting everything he could possibly get for his pain. And yes, it's a sympathetic position that he was in. But this does not amount to serious medical need and deliberate indifference on the part of Drs. Rodriguez and Gomez. So for those reasons, Your Honor, we respectfully request that you reverse the judgment and enter judgment on these issues for Drs. Rodriguez and Gomez. Thank you. All right. Thank you very much, Counsel. And court is adjourned.